Charles A. McManus *v.* Robert Laughlin and William King. Annie G. Summers, Appellant.

*Husband and wife—Conversion of wife's property by husband—Brokers.*

Where a husband who is in the habit of attending to his wife's business, obtains from her securities with executed power to transfer, for the purpose of loaning them to a firm of brokers, under a promise not to use them in his own speculations, and he does so loan them, but subsequently hypothecates them with the brokers as security for his own speculations; the brokers having no knowledge of the promise made by the husband to the wife, and the wife, having raised no objections to the use which the husband was making of the securities for a considerable period of time after she learned the facts, she cannot, after the failure of the brokers, claim a preference over general creditors in the distribution of the firm's assets.

Argued Jan. 25, 1898. Appeal, No. 110, Jan. T., 1897, by defendant, from order of C. P. No. 3, Phila. Co., Dec. T., 1892, No. 949, dismissing exceptions to auditor's report. Before STERRETT, C. J., WILLIAMS, McCOLLUM, MITCHELL and FELL, JJ. Affirmed.

Exceptions to auditor's report.

The case was referred to Charles Biddle, Esq., as auditor, who reported the facts to be as follows:

FINDINGS OF FACT RELATING TO THE CLAIM BASED UPON THE SHARES OF PENNSYLVANIA RAILROAD STOCK AND UPON THE PITTSBURG, TITUSVILLE & BUFFALO RAILROAD STOCK.

On about May 21, 1883, William D. Summers asked his wife, Annie G. Summers, the claimant in this case, to let him have four hundred shares of Pennsylvania Railroad stock that she was then the possessor of; that Mr. Laughlin, of the firm of Laughlin & McManus, had asked him for a loan of some collateral upon which money could be borrowed, and he wanted this stock for the purpose. He also told her that he would get value for the stock from Mr. Laughlin. Mrs. Summers trusted her husband with the management of her affairs, and permitted him to determine what should be done with her investments. She trusted him to such an extent, as is shown by the testimony, that she has lost by his dealings at one time or another, nearly

all of her estate, amounting to $125,000. Therefore, when he made these representations and promised her that the stock would not be used for his own speculations, she gave him the four hundred shares of Pennsylvania Railroad stock for the purpose of loaning them to Mr. Laughlin, and executed, in blank, powers of attorney for their transfer; Mr. Summers witnessed the execution of these powers.

When Mr. Summers had thus obtained the shares of stock he loaned them to Robert Laughlin for the firm, or, as one witness stated, he made with him an exchange of collateral. He delivered the Pennsylvania stock to Mr. Laughlin and received in exchange thirteen hundred shares of Pittsburg, Titusville & Buffalo stock, which was about equal in value at that time to the Pennsylvania stock. At the date of the receivership its market value was $7.38 a share.

This exchange or loan was made, Mr. Summers states, in order to give the firm of Laughlin & McManus collateral which was more easily pledged than the Titusville stock. The Titusville stock was given with powers of attorney for their transfer attached, and Mr. Summers was entitled to do as he liked with the stock so far as Laughlin & McManus were concerned; but it was understood that he could demand back the Pennsylvania stock and return the Titusville stock if he or his wife desired to do so.

Mr. Laughlin knew the Pennsylvania stock belonged to Mrs. Summers, and Mr. Summers got the stock from her at his suggestion; but there is no evidence to show that Mr. Laughlin knew anything about the promise made by Mr. Summers to his wife. There is no doubt that the original understanding between Mr. Summers and Mr. Laughlin when the four hundred shares were deposited was, as has been described, an exchange of securities. But this understanding was subsequently changed by Mr. Summers and Mr. Laughlin, and the Pennsylvania stock was placed with the firm of Laughlin & McManus, as collateral security for the operations of Mr. Summers in the purchase and sale of securities through the firm.

The shares of the Pittsburg, Titusville & Buffalo stock were returned to Laughlin & McManus, and as the agreement had been changed and the Pennsylvania stock placed to the credit of Mr. Summers, no demand was of course made for its return.

Some of the shares of the Titusville stock Mr. Summers testifies he returned to the firm of Laughlin & McManus as collateral security for some of his own transactions. An explanation of how he was able to apply them in this way to his own credit may be found in the fact that it is shown by the books of Laughlin & McManus that certain shares of the Pittsburg, Titusville & Buffalo stock were purchased by Mr. Summers for his own account. In this way all of the Titusville stock passed out of the hands of Mr. Summers, and the Pennsylvania stock was placed with the firm as collateral security for his transactions.

Mrs. Summers never knew that her husband had received the Pittsburg, Titusville & Buffalo stock in exchange for the Pennsylvania Railroad stock, but your auditor finds as a matter of fact that she acquiesced in and had a knowledge of the change that was made in the original understanding with her, and that she knew the Pennsylvania stock was no longer held as a loan by Laughlin & McManus, but was held as collateral security for the transactions Mr. Summers had with that firm, and she made no objection. Mrs. Summers subsequently wished to get back one hundred of the four hundred shares deposited with the firm, and for the purpose of redeeming that number, paid the firm $5,000. The books show that this redemption of the one hundred shares of stock took place April 14, 1885.

Mrs. Summers does not, from the testimony, appear to have had any knowledge of the particulars of her husband's transactions with Laughlin & McManus, but states that she knew he had business with the firm. She denies that she knew or suspected Mr. Summers of using her stock for his own purpose until about two years before the failure.

After the one hundred shares of the Pennsylvania Railroad stock had been redeemed by Mrs. Summers, the three hundred shares that remained with Laughlin & McManus continued upon their books as collateral for purchases made on behalf of Mr. Summers, and were so credited to him, up to the time of the appointment of the receiver, and the firm paid him for his wife the dividends that were declared upon the stock up to that period.

The stock originally deposited was transferred out of the name of Mrs. Summers some years before the failure; one hundred shares were transferred upon the powers originally given

by Mrs. Summers in 1883; two hundred of the three hundred shares were transferred by means of new powers which were given by her some years afterwards. Mr. Summers states that after he had given Mr. Laughlin the stock, Mr. Laughlin told him that the transfer from his wife's name would not be made, and that it was understood that the transfer of this stock out of Mrs. Summer's name was only for a temporary purpose.

At the time of the failure Mr. Summers was largely indebted to the firm, and when the receiver credited his account with the proceeds of three hundred shares of Pennsylvania Railroad stock, which were then sold, it still left a large balance due by him to the firm.

FINDINGS OF FACT RELATING TO THE CLAIM BASED UPON THE SHARES OF THE GREEN AND COATES STREETS PASSENGER RAILWAY STOCK.

About May 21, 1887, Mrs. Summers put into her husband's possession one hundred shares of stock of the Green and Coates Streets Passenger Railroad Company. It was not very clear what representations were made to Mrs. Summers by her husband at the time she entrusted him with these shares, except that he assured her he would not use the stock for his own speculations, and told her that he was borrowing it at Mr. Laughlin's suggestion, and would get value for it. There is no testimony to show that Mr. Laughlin had made any suggestions to Mr. Summers; but relying upon the assurance made by her husband, Mrs. Summers executed a blank power of attorney for the transfer of this stock, which power was witnessed by her husband, and she handed him the stock as he requested.

When Mr. Summers thus secured the one hundred shares of Passenger Railway stock, he took them to Laughlin & McManus and used them as collateral security for the purchase of Columbian Gas stock and as collateral for other purchases, until the time of the failure, at which time he was indebted to the firm in the sum of $100,000, an amount far in excess of the value of any of the collateral which he had placed in their hands. There is no evidence to show that at the time the stock was placed with Laughlin & McManus any of the firm knew that the stock was the property of Mrs. Summers, except from the

fact that it stood in her name. The purchases and sales made by Laughlin & McManus for Mr. Summers, while speculative in their character, were not gambling transactions as far as Laughlin & McManus were concerned. They regularly purchased or sold stock as Mr. Summers ordered or directed them.

Mrs. Summers never had any communication directly with any member of the firm of Laughlin & McManus; everything was done through her husband, and she never appeared in any way upon their books. It is also shown by the testimony that Mr. Summers was engaged in many transactions with Mr. Laughlin, which were in no way connected with the business of the firm. These findings of fact apply equally to the other claims of Mrs. Summers under consideration.

### FINDINGS OF FACT AS TO THE CLAIM FOR $1,250.

Mr. Summers had in his possession belonging to his wife certain shares of Tacony land stock. He offered them as collateral to Mr. Laughlin for a loan which he made with the firm; but Mr. Laughlin told him they had not a regular market and were of little or no value, and that they did not want them. Mr. Summers, nevertheless, left the stock in a tin box belonging to the firm. Subsequently, the loan which he made with the firm was paid off, but he did not take the Tacony stock away with him. After the failure of the firm it was found that Mr. Laughlin had used this stock by placing it as collateral security for a loan which he had individually made with the Farmers' & Mechanics' National Bank. There is no evidence to show that the Tacony stock was used in any way for the benefit of the firm. Mr. Laughlin had many individual dealings, irrespective of his firm, and there is no reason to suppose that he did not appropriate this stock and use the money obtained upon it for his individual purposes. When Mrs. Summers found that the Tacony stock had been hypothecated, she paid $1,250 for the purpose of redeeming it from the Farmers' & Mechanics' Bank. She now claims this amount out of this fund. However good a claim Mrs. Summers may have against Mr. Laughlin, individually, for the money so paid, your auditor can find no testimony that warrants his holding the firm liable for this stock, or for finding that this transaction was a partnership matter.

### CONCLUSIONS.

The facts of this case have been determined entirely from the testimony offered by the claimant, and by an examination of the books of Laughlin & McManus. No evidence was offered by the receiver or by any of the other creditors to answer the testimony produced by Mrs. Summers. Mr. Laughlin, with whom these transactions were made, is no longer in this jurisdiction; but an examination of the testimony offered by the claimant leaves little doubt as to what was done with the Pennsylvania Railroad stock, the claim upon which should first be considered.

The four hundred shares of Pennsylvania Railroad stock were exchanged for the Pittsburg, Titusville & Buffalo stock, with the understanding that Mr. Summers was to receive back the Pennsylvania stock should he make a demand for them; and upon the happening of such an event, he was, of course, to return the Pittsburg, Titusville & Buffalo stock which he had received in exchange. This agreement or understanding was afterwards changed; Mr. Summers returned the Pittsburg, Titusville and Buffalo stock to Laughlin & McManus and used the Pennsylvania stock as collateral for the transactions which he made through the firm.

The first question to be decided is whether this change in the disposition of the stock was made with the knowledge of Mrs. Summers, the owner of the stock; and second, if it was not made with her knowledge, whether the firm of Laughlin & McManus were justified in assuming that the husband was authorized not only to loan them the stock as they had originally asked, but also to dispose of it to his own advantage, and were thus protected as bona fide holders for value. Mrs. Summers states that she knew her husband had used her stock about two years before the receivership, but not prior to that period. The testimony, however, of Mr. Summers, to the effect that his wife paid $5,000 for the purpose of redeeming one hundred of the four hundred shares of Pennsylvania Railroad stock originally deposited, as far back as 1885, is the strongest possible evidence that she must have known at that time that she was not entitled to take her stock back upon demand, or that it was simply loaned as she states she had originally intended it to be; and when we couple this with what is appar-

ently undisputed, that for two years prior to the failure she did know that her husband had used her stock, and yet took no steps to recover it back and made no inquiries of Laughlin & McManus, the conclusion is almost irresistible that in this case, as with the rest of her fortune, she knew what her husband was doing, trusted him, and made no objection, hoping that his investments or speculations would prove profitable in the end. In the opinion of your auditor she acquiesced in the disposition of her securities by her husband, and sanctioned it by her silence since 1885. She cannot, therefore, come in as against the creditors of the firm and ask that the value of her property be returned to her, and leave a large debt unpaid which her husband was able to incur with the firm of Laughlin & McManus, by reason of her acquiescence in his use and disposition of her stock for so many years. The creditors are innocent parties in this matter, and however innocent and wronged Mrs. Summers may be by her husband's actions, she has not been without fault. The large loss might have been prevented if she had not remained inactive. Even under her own testimony, she had ample information to put her upon notice; she should have taken steps at once to prevent the improper conversion of her securities, if she considered it improper for her husband to use them. In this appeal to a court of equity, she is sadly deficient in the vigilance that is a necessary prerequisite to assistance from this forum.

If the court should be of the opinion that Mrs. Summers is not estopped from making the present claim upon the Pennsylvania Railroad stock, it must then be determined whether Laughlin & McManus were justified, as Mrs. Summers had given her husband the apparent ownership of the stock, in treating him as though he were the actual owner. This proposition would be answered by a quotation from Leiper's Appeal, 108 Pa. 377, if it were not for the apparent complication by reason of the conversations and understandings Mr. Summers had with Mr. Laughlin at the time he first got this stock and placed it with the firm.

There is no doubt that, under the case just quoted, and under Souder v. The Bank, 156 Pa. 374, an innocent holder for value who takes from a husband stock standing in the name of his wife, for the transfer of which proper powers have been

executed by her, is always protected, even though the husband is acting in bad faith to his wife in disposing of her property, if knowledge of this bad faith is not brought home to the purchaser; but the question here is, does the fact that Mr. Laughlin knew that the stock belonged to Mrs. Summers, and that it had been gotten from her at his request for the purpose of a loan to him, prevent the firm from afterward taking it upon Mr. Summers's authority alone and applying it to a different purpose, namely: that of giving him a credit with the firm? It might reasonably be argued that as there is no evidence that any part of the conversation between Mr. Summers and his wife was detailed to any member of the firm of Laughlin & McManus, they might consider that Mr. Summers had authority, not only to use the stock for the purpose of an exchange of collateral, but for any purpose that he saw fit. Mr. Summers had apparently been accustomed to doing pretty much as he liked with the property of his wife; but there is no doubt that upon this occasion he promised her not to use the stock for his own speculations or transactions. This promise was not, however, known to Laughlin & McManus, and Mrs. Summers did nothing to give them notice that it had been made, and never had any intercourse with them except through Mr. Summers. Her husband was given the apparent authority to do as he liked, and was furnished with blank powers to transfer the stock, and there is no evidence to show that Mrs. Summers had made any inquiry of him as to what he had done with the stock until years afterwards. Under these facts it hardly seems equitable to say that, because Mr. Laughlin knew that Mr. Summers went to his wife to ask the privilege of loaning her stock to the firm, it was the duty of the firm to presume that she deviated from her usual course and gave him only the right to use it for that special purpose; but if such should not be the opinion of the court it would still be going very far in the opinion of your auditor to hold that Mrs. Summers is so free from negligence that she can now, as against these creditors, take advantage of the improper assumption of Laughlin & McManus.

The question as to what ground Laughlin & McManus had for trusting Mr. Summers is, of course, immaterial if, as your auditor has found, Mrs. Summers subsequently ratified what her husband had originally done without her knowledge.

It is not necessary to enlarge upon the claim based upon the Pittsburg, Titusville & Buffalo stock, as a disallowance of the claim upon the Pennsylvania stock involves a disallowance of the claim upon the Titusville stock.   The claimant seeks to enforce the original contract, and claims that under it the Pennsylvania stock is the original debt, and the Titusville stock is the collateral.   Your auditor, however, does not see how such a claim can be sustained when the whole testimony in this case is considered.   The evidence shows that in this transaction the Titusville stock was a substitute for the Pennsylvania stock, and the former stock was practically to belong to Mr. Summers if he did not demand the return of the latter.   He never did make a demand for the latter, and if we are to consider the original contract as still in force, Mrs. Summers has no title whatever to the Pennsylvania Railroad stock if she takes the position that she is entitled to the Pittsburg, Titusville & Buffalo stock; and the converse is equally true, if she claims the Pennsylvania stock, she must surrender the other.

When she bases her claim upon the agreement that was made with her husband she must take it as it stands; she cannot enforce the contract contrary to its terms.   If she claims that she is entitled to recover the value of that which was substituted for her stock, on the ground that her husband had no right to give the substitute up, she cannot at the same time ask payment for the property which was surrendered.   The evidence will not support the position that she is in any way entitled to both.

CLAIM FOR THE VALUE OF THE GREEN & COATES STREET
PASSENGER RAILWAY STOCK.

This claim must also be disallowed for the reasons that have already been outlined in the claim for the Pennsylvania Railroad stock.   Laughlin & McManus took this stock from Mr. Summers, who had it in his possession, with proper powers of attorney for its assignment, executed by his wife and witnessed by himself.   The firm had no knowledge of any agreements made between Mr. Summers and his wife; and under the decisions already quoted, the fact that the stock is in her name is not sufficient to put them upon notice.   They were legally entitled to consider that his wife had either given or loaned him the stock without restriction or limitation.   Stress has been

laid upon the fact that Mr. Laughlin said he would not trans-
fer the shares out of the name of Mrs. Summers; but this must
be taken to mean that he would not do so as long as it was
unnecessary to sell the securities for the payment of Mr. Sum-
mers's debts. This promise does not prove that Mr. Laughlin
knew that Mr. Summers had no right to use this stock, and it
is entirely consistent with the theory that the stock was merely
placed as collateral for a debt which Mr. Summers no doubt ex-
pected to pay by means of the profits of his transactions.
Neither is the testimony material which shows that, during all
of the time that this stock was in Laughlin & McManus's pos-
session, they paid over to Mr. Summers the dividends which
were declared upon it. This is the ordinary course of brokers
when securities are left with them as collateral, and this course
is usually continued until the collateral has been appropriated
to the payment of the debt, which was not done in the present
case until after the firm had failed.

### CLAIM FOR $1,250.

It is unnecessary to comment upon this claim, as your auditor
has found as a matter of fact that the transaction upon which it
is based was not a partnership matter. Your auditor therefore
finds, for the reasons given, that this fund is not liable for the
payment of any of Mrs. Summers's claims.

Exceptions to the auditor's report were overruled.

*Errors assigned* were in dismissing exceptions to auditor's
report.

*E. Spencer Miller*, for appellant, cited Ramsey's Appeal,
2 Watts, 228.

*Thomas R. Elcock* and *John G. Johnson*, with them *Bernard
Gilpin*, for appellees, cited Leiper's App., 108 Pa. 377, and
Souder v. Bank, 156 Pa. 374.

PER CURIAM, July 21, 1898:
This appeal by Annie G. Summers is from the decree dismiss-
ing exceptions, confirming the auditor's report and ordering
distribution in accordance therewith.

It is unnecessary to refer in detail to the forty-seven exceptions to the auditor's report, filed on behalf of appellant, or to the several questions involved in the assignments of error. To do so would consume much time to no good purpose. It is sufficient to say, as the result of a careful examination of the record, that the court below was clearly right in approving the learned auditor's findings of fact and conclusions of law upon which its decree is based. We find nothing in the record that requires either a reversal or modification of the decree.

Decree affirmed and appeal dismissed at appellant's costs.